# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

        Plaintiff,

    v.                               Case No. 05-CR-175

**RODOLFO R. RODRIGUEZ,**

        Defendant.

## RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA ON THE DEFENDANT'S MOTION TO SUPPRESS

On July 12, 2005, the grand jury returned a single-count indictment against Rodolfo R. Rodriguez ("Rodriguez"), charging him with unlawfully transporting stolen computer equipment in interstate commerce. Rodriguez filed a motion to suppress the equipment specified in the indictment, which was obtained pursuant to the October 13, 2004 search of his semi truck by Kentucky Vehicle Enforcement ("KVE") officers, and any derivative evidence. The pleadings on Rodriguez's motion to suppress closed as of October 20, 2005, and the motion is now ready for resolution. A jury trial is scheduled to commence before the Honorable Rudolph T. Randa on November 7, 2005, with voir dire set for November 4, 2005.

On September 26, 2005, this court conducted an evidentiary hearing to address Rodriguez's motion to suppress. The government appeared by Assistant United States Attorney

1

Gail J. Hoffman and presented the testimony of KVE officers John White ("Officer White") and Robert Dale ("Officer Dale"). Rodriguez appeared in person and by his attorney, Brian Mullins. In addition, Rodriguez presented testimony on his own behalf, as to his ability to speak and understand the English language. Defense counsel asked to address that issue for the first time at the evidentiary hearing. This request was untimely, because, when a movant seeks an evidentiary hearing, Criminal Local Rule 12.3 requires the movant to have a conference with the non-moving party and then provide a description of the material disputed facts that the movant claims require an evidentiary hearing. In complying with Rule 12.3, Rodriguez did not indicate that his understanding of English was in dispute. In addition, the government confirmed that Rodriguez did not challenge the legality of his consent in a letter filed subsequent to Rodriguez's evidentiary hearing request. (Hoffman Ltr. Sept. 7, 2005.).

Despite that the issue was not previously raised in accordance with Rule 12.3, the court permitted testimony regarding Rodriguez's ability to understand English. In addition, the court indicated that the parties could brief the issue of Rodriguez's linguistic ability in their respective post-hearing submissions, as necessary. (Tr. 4-5.). However, Rodriguez's testimony reveals that he had sufficient understanding of the English to fill out the bill of lading and his daily driver's log in English. Rodriguez's statements in English to the KVE officer that stopped his semi truck were also responsive to the questions asked. For those reasons, and because Rodriguez's post-hearing brief does not challenge his ability to understand English, any issue regarding Rodriguez's consent will not be discussed further.

Officers Dale and White presented testimony as to the events of the October 31, 2004 inspection of Rodriguez's semi truck that is challenged in the pending motion to suppress. Their

testimony is largely undisputed.  Officer White initiated the traffic stop, and his testimony will be discussed first.

**I. Officer John White**

Officer White stopped Rodriguez's truck while on patrol in Hardin County, Kentucky to conduct a safety inspection. (Tr. 26-27.).  Officer White asked Rodriguez for several documents that are subject to inspection, including Rodriguez's medical card, truck and trailer registration, driver's logs, and bill of lading.  (Tr. 28.).  The bill of lading raised Officer White's suspicions because it was on a generic form not ordinarily used, did not list a location where the load originated or the supplier's phone number, and lacked a shipper's number.  (Tr. 30.).  In addition, the bill of lading listed only an address rather than a company name or contact phone number for the destination.  (Tr. 30.).  Officer White testified that this lack of detail stood out to him because a typical bill of lading contains significant detail regarding the contents of the load and the shipper.  (Tr. 46.); see 49 C.F.R. § 375.505.  Officer White also found it suspicious that there was a seal number on the bill lading and no seal on the trailer and that Rodriguez was carrying cargo but did not lock the trailer.  (Tr. 30.).

Rodriguez's driver's logs also contained irregularities.  The logs indicated that Rodriguez was in Wisconsin on October 29, 2004 at noon, off duty, and then in the sleeper birth of the truck until 10:15 a.m. on October 31, 2004.  Officer White believed that the logs were false because Rodriguez was stopped at 12:45 p.m. eastern time in Kentucky and could not have traveled to Kentucky from Wisconsin in the few hours that Rodriguez's logs indicate he was driving.  (Tr. 31-32; Hrg. Ex. 4-6.).

At that point, Officer White asked to see Rodriguez's cargo to verify that it consisted of twelve packages of office supplies, as indicated on bill of lading, and Rodriguez complied by

3

opening the rear of the trailer. (Tr. 32; Hrg. Ex. 3.). From the street, Officer White observed that the load consisted of several boxes that were not bound, wrapped, or on pallets. (Hrg. Ex. 1.). Officer White testified that federal regulations govern the manner in which cargo is secured (49 C.F.R. § 393.100), and that the boxes in Rodriguez's trucks were not packaged in accord with the usual practice. (Tr. 33-34; see also Tr. 53, 55.). Officer White then called for Officer Dale, who was stationed across the highway. Approximately five minutes had elapsed from the time of the initial stop when Dale was summoned. Officer White then told Rodriguez that he would be placed out of service for ten hours and issued Rodriguez a citation for maintaining a false record of duty. (Tr. 34-35.). Officer White also asked for Rodriguez's consent to search the semi truck, Rodriguez agreed, and signed a written consent to search form. (Tr. 35-37.). Subsequently, Officers White and Dale searched Rodriguez's vehicle, as discussed in conjunction with Officer Dale's testimony.

**II. Officer Robert Dale**

Officer Dale had been patrolling in the area when Officer White summoned him to the traffic stop to assist with the safety inspection paperwork. (Tr. 42-43.). After arriving at the scene and learning of the irregularities observed by Officer White, Officer Dale went into the trailer to determine whether Rodriguez's cargo matched the description on the bill of lading, to look for proper securement, and to ensure that the load did not contain hazardous materials. He did not search the truck. (Tr. 55.). While inspecting the boxes for the stated purposes, Officer Dale said that he observed a label on the boxes that indicated they were from a business located in Waukesha, Wisconsin. (Id.). After contacting several different law enforcement officials in Wisconsin, Officer Dale learned that the boxes had been stolen. (Tr. 56-58.). In addition,

4

Case 2:05-cr-00175-RTR    Filed 10/28/05    Page 4 of 12    Document 19

Kentucky dispatchers informed Officer Dale that the destination address listed on the bill of lading was not valid and Rodriguez's employer denied knowledge of Rodriguez's load. (Tr. 54, 62.).

After Officer White obtained Rodriguez's oral and written consent to search the truck and trailer, Officer Dale walked a drug dog, which stays in his custody (Tr. 42.), around the outside of the truck. (Tr. 59-61; see also Tr. 47.). The dog did not alert at that time or during a subsequent interior search of the vehicle. (Tr. 64-66.).

### III. Rodriguez's Motion to Suppress

Rodriguez sets forth two bases for suppression in his motion: (1) that the Kentucky statute and federal regulations that allow law enforcement officers to randomly stop and inspect commercial trucks does not meet the standard for a warrantless, administrative search that was established in New York v. Burger, 482 U.S. 691 (1987) and (2) that Officers White and Dale exceeded the scope of any valid authority they might have to conduct an administrative search. (Rodriguez Post-hrg. Br. at 1-2.). Each claim will be discussed in turn.

#### 1. Validity of the Warrantless Administrative Inspection

It is well established that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to commercial property as well as the home. New York v. Burger, 482 U.S. at 699; Lesser v. Espy, 34 F.3d 1301, 1305 (7th Cir. 1994)(citing Marshall v. Barlow's, Inc., 436 U.S. 307, 311 (1978). Thus, an owner or operator of a business has a reasonable expectation of privacy in commercial property. This expectation, however, is different from, and indeed somewhat less than, the privacy expectation in one's home. Burger, 482 U.S. at 699. While a search of a private residence generally must be conducted pursuant to a warrant in order to be reasonable, Payton v. New York, 445 U.S. 573 (1980), a warrantless administrative search of commercial property does not per se violate the Fourth Amendment.

5

Determining whether a warrantless administrative search is reasonable entails a four-step analysis. First it must be determined whether governmental regulation of the industry in question is "pervasive." Burger, 482 U.S. at 700-02. Governmental regulation is "pervasive" if the regulatory presence is so comprehensive and defined that the business owner cannot help but be aware that his commercial property will be subject to periodic inspections undertaken for specific purposes. Id. at 705 n. 16 (citing Donovan v. Dewey, 452 U.S. 594, 600 (1981)).

If this requirement is met, a warrantless inspection of a business in a pervasively regulated industry will not be considered reasonable unless three additional criteria are met. Id. at 702-03. First, there must be a substantial governmental interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. And, third, the statute's inspection program must perform the two basic functions of a warrant: (1) it must advise the owner of the premises that the search is being conducted pursuant to the law and within a properly defined scope; and (2) it must limit the discretion of the inspecting officers. Id. at 703. To perform the limiting function, the statute must be "'carefully limited in time, place, and scope.'" Id. (quoting United States v. Biswell, 406 U.S. 311, 315 (1972)).

Arguing that applicable statutes and federal regulations inadequately limit the officers' discretion in the present case, Rodriguez disputes only the second prong of the final requirement. In support of his challenge, Rodriguez cites the applicable Kentucky statute relating to administrative searches of commercial motor vehicles, which reads, in pertinent part, as follows:

> [t]he commissioner and representatives of the Department of State Police may at ***any time or place*** make an inspection of any motor vehicle operating under the provisions of this chapter. They may enter into and upon any such motor vehicle for the purpose of ascertaining whether or not any provision of this chapter or any

6

order or rule or regulation of the department relating to such motor vehicles has been violated.

KY. REV. STAT. ANN. § 281.755(1)(emphasis added). In addition, Rodriguez also relies upon the fact that KVE officers are not bound to any particular standard when determining the level of search that is most appropriate.

In the opinion of this court, suppression is not warranted based on either of the two grounds argued by Rodriguez. Officer White inspected Rodriguez's truck pursuant to the North American Standard Inspection Program ("NASIP"), which is adopted under Kentucky law. Under NASIP, officers may choose to conduct any of six levels of inspection. For purposes of this case, only the Level II and Level III inspections are relevant. A Level III inspection focuses on the driver, requiring that the officer review the driver's license, medical certification, record of duty (or driver's log), hours of service, seat belt, vehicle inspection report and HM requirements, as applicable. A Level II inspection is inclusive of the Level III inspection, but the officer also inspects equipment that can be examined without physically getting under the vehicle. This includes, inter alia, an inspection of the load for securement and a check for hazardous materials. See Federal Motor Carrier Safety Administration – North American Standard Driver/Vehicle Inspection Levels, available at http://www.fmcsa.dot.gov/safetey-securit/safety-initiatives/mcsap/insplevels.htm; see also 49 C.F.R. § 350.105.

While the NASIP, Kentucky Statute § 281.755(1), and the applicable federal regulations allow officers substantial discretion in determining where, when, and pursuant to which level an inspection should be conducted, it is clear that an officer's discretion has well-defined limits. Because the Level II inspection is more comprehensive than the Level III inspection, and was the basis for Officer White's and Officer Dale's entry into Rodriguez's truck, the court's analysis will

7

focus on the limitations regarding that type of inspection. The court will then analyze Rodriguez's claim based on an officer's discretion to move from a Level II to a Level III inspection.

The guidelines for conducting a Level II inspection are intricately detailed. Consisting of twenty-two parts with numerous bullet points and a diagram reference, a Level II inspection defines each part of a commercial vehicle that an officer is expected to review, sets forth instructions for inspecting each item, and references any applicable section of the Code of Federal Regulations. For example, with respect to an officer's inspection of the "left saddle tank area," an officer is instructed as follows:

> LEFT SADDLE TANK AREA
>     Left Fuel tank(s) (§ 393.65)
> Check for unsecure mounting, leaks, or other damage. Verify that the fuel cross-over line is secure. Check for unsecure cap(s).
> Check ground below tank for signs of leaking fuel.
>     Tractor frame (§ 393.201)
> Check frame rails and cross members on the tractor just behind the cab, looking for cracks, bends, or excessive corrosion.
>     Exhaust System (§ 393.83)
> Check for unsecure mounting, leaks (under the cab), exhaust contacted by fuel or air lines or electrical wires.

As dictated by the detail of instructions such as this, an officer has little discretion when conducting a Level II inspection. Moreover, the inspections are confined to vehicle parts and other matters that directly relate to the safe operation of commercial vehicles. This is consistent with the limitation that officers may enter a motor vehicle "only for the purpose of ascertaining whether or not any provision of this chapter or any order or rule or regulation of the department relating to such motor vehicles has been violated." § 281.755(1). This means that officers have no authority to search a driver's personal belongings or other areas of the truck that might conceal criminal activity but that do not regard the safety concerns addressed in the regulations.

8

This significant limitation on the scope of a search outweighs the fact that § 281.755(1) authorizes officers to conduct an inspection "at any time or place." As several courts have noted, commercial trucking is a twenty-four hour industry. Commercial truckers could ignore regulations and render them meaningless by simply operating their vehicles outside the designated inspection period, if specific time periods were established. United States v. Dominguez-Prieto, 923 F.2d 464, 470 (6th Cir. 1991)("a [time] limitation would, of course, render the entire inspection scheme unworkable and meaningless"); United States v. Vasquez-Castillo, 258 F.3d 1207, 1212 (10th Cir. 2001). Because the commercial trucking industry is mobile, restrictions on the place of inspection would have the same affect. Given the subject matter governed and the significant scope restrictions for a Level II inspection, the court believes that the regulatory scheme is sufficiently limited.

Moreover, it would be unreasonable to restrict an officer's discretion to conduct a Level II inspection, rather than a Level III inspection, to particular factors or a standard of suspicion. The point of a Level II inspection is to check for internal malfunctions and improper maintenance. Vehicle malfunctions and improper maintenance create dangers, both to truck drivers and other persons on the road. Furthermore, such conditions are not always easily observable. Therefore, conducting the detailed Level II inspection described above might provide both an officer and the driver the first notice that certain safety risks exist. While concerns that a load is secure should be paramount for a driver, officers cannot be certain that appropriate procedures have been followed without randomly searching vehicles they encounter. Thus, even an initial Level II inspection is sufficiently limited for purposes of the third Burger requirement, and the distinction between a Level II and a Level III inspection is not determinative. Accordingly, the court will recommend that the motion to suppress be denied in this regard.

9

## 2. Scope of the Inspection

Rodriguez's second claim is that Officers White and Dale exceeded the scope of their regulatory authority to conduct a warrantless search on these facts. In support of this argument, Rodriguez makes two claims. First, he says that Office White should not have moved from a Level II to a Level III inspection. For the reasons discussed in the previous section, and based on the attendant circumstances, that position is not persuasive. In particular, when the regulatory scheme is considered in light of the facts of this case, it is clear that Officers White and Dale acted well within what the Fourth Amendment deems reasonable. Officer White observed many irregularities during his initial contact with Rodriguez. As mentioned earlier, Rodriguez's record of duty was false, the trailer was unlocked but was supposed to contain goods, there was no seal on the trailer despite records that indicated there should be, and the bill of lading was incomplete. Under these circumstances, Officer White had sufficient reason to conduct a Level II inspection, even if some level of suspicion would be required for him to escalate his efforts. Furthermore, both officers adhered to the limits of their regulatory authority by focusing on safety concerns while the inspection was ongoing.

Accordingly, the court will turn its attention to Rodriguez's final argument. Rodriguez says that the officers exceeded their authority by asking for consent and by using the drug dog to inspect the truck. The testimony of Officers White and Dale accords with that position. Officer White testified that the false log book did not give him basis to search the truck for contraband and that the regulations do not permit him to search the truck even if the driver is placed out of service. (Tr. 41, 44.). Officer Dale stated that the administrative inspection was complete prior to the time that Officer White sought Rodriguez's consent to search the truck. (Tr. 68.).

However, this does not mean that suppression is warranted. Law enforcement officers may seek consent to search at any time. This does not bear on administrative search authority or relate to the officers' suspicions of Rodriguez. In fact, police may request consent to search an individual's property with absolutely no ground for believing that the person had committed any wrongdoing. United States v. Liss, 103 F.3d 617, 621 (7th Cir. 1997)(citing Florida v. Bostick, 501 U.S. 429, 434-35 (1991)). Moreover, the Burger court itself discussed the fact that officers are not required to ignore their duty to enforce criminal law when acting pursuant to their regulatory authority. In this regard, the Burger court stated "so long as a regulatory scheme is properly administrative, it is not rendered illegal by the fact that the inspecting officer has the power to arrest individuals [or, as in this case, to seek consent to search] for violations other than those created by the scheme itself." Burger, 482 U.S. at 717. Accordingly, Officer White's actions subsequent to the administrative search do not warrant suppression.

In his reply brief, Rodriguez notes that an otherwise valid consent cannot preclude suppression if it is the result of an illegal search or seizure. (Rodriguez Reply at 3 (citing United States v. Jerez, 108 F.3d 684, 694-95 (7th Cir. 1997).). Rather, consent prevents suppression only if it is "sufficiently distinguishable [from the illegal search or seizure] to be purged of the primary taint." Because this court has concluded that the Kentucky statutes and the federal regulations that govern commercial trucking satisfy Burger, there is no basis for questioning the validity of the stop prior to Rodriguez's consent. Moreover, Officer Dale testified that he observed the Wisconsin address that led him to discover that the boxes were stolen when he entered the trailer to check the load's securement and to inspect for the presence of hazardous materials. This was prior to the consensual search. It appears that no additional evidence was obtained from the search

11

itself. Accordingly, the court will recommend that the motion to suppress be denied as to this basis for relief as well.

For all the reasons discussed, the court now enters the following recommendation on Rodriguez's motion to suppress:

**IT IS THEREFORE RECOMMENDED** that Rodriguez's motion to suppress be **denied.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this <u>28th</u> day of October, 2005.

_____
s/<u>AARON E. GOODSTEIN</u>
United States Magistrate Judge